James M. PREE, Appellant,

v.

The BRUNSWICK CORPORATION,
Appellee.

No. 91–3402.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Jan. 7, 1993.

Rehearing and Rehearing En Banc
Denied Feb. 12, 1993.

**864**

Alan G. Kimbrell, St. Louis, MO, argued, for appellant.

Joseph H. Mueller, St. Louis, MO, argued, for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

James M. Pree appeals from a final judgment entered in the United States District Court[1] for the Eastern District of Missouri, following a jury verdict in favor of appellee, The Brunswick Corporation, in a product liability action alleging that a design defect in appellee's engines caused them to be unreasonably dangerous and that this defect resulted in enhanced injuries. For reversal, Pree argues that the district court erred in (1) admitting evidence of his drinking and intoxication before the accident and (2) instructing the jury on contributory fault. For the reasons discussed below, we affirm the judgment of the district court.

## BACKGROUND

James Pree was injured on July 5, 1985, when he fell from the back of a 1985 Wellcraft Scarab II pleasure boat[2] owned by Todd Beckman. Pree and several friends had been spending the July 4th weekend at the Lake of the Ozarks drinking and partying. On the morning of July 5th, at about 1:15 or 1:30 a.m., Beckman attempted to dock the boat which was powered by twin Mercury Marine 330 horsepower motors. It was raining, the water was "choppy" and there was some lightning. As Beckman backed the boat into the slip, he asked Pree to "get the back of the boat." Pree was standing on the swim platform on the back of the boat. As Pree reached out to grab the dock pole, the boat suddenly moved forward and he fell off the boat into the water. Pree was severely injured by the unguarded, rotating propeller blades. He suffered compound fractures, cut tendons, and permanent muscle and nerve damage.

On October 3, 1989, Pree filed suit in the Circuit Court of the City of Saint Louis, Missouri, against appellee the parent company of Mercury Marine, the designer and manufacturer of the motors, including the drive mechanism which required a propeller, and Genmar Industries, Inc., the successor corporation to Wellcraft Marine Corporation, the boat manufacturer and seller. Pree claimed that the propeller was defective and unreasonably dangerous because it was not equipped with a propeller guard. On October 25, 1989, appellee removed the action to the United States District Court for the Eastern District of Missouri. On January 30, 1991, Pree dismissed his claim against Genmar Industries, Inc.

On September 1991, the parties tried the case and the district court, over Pree's motion in limine and objection, admitted evidence that Pree had been drinking various alcoholic beverages all day and well into

---

1. The Honorable Frederick Buckles, Magistrate Judge, United States District Court for the Eastern District of Missouri. The parties consented, pursuant to 28 U.S.C. § 636(c) to allow the magistrate judge to conduct all proceedings, including entry of judgment.

2. Boats of this sort are also known as "planing" pleasure crafts, because as they increase in speed they rise partly out of the water and plane on the surface. *See Elliot v. Brunswick Corp.,* 903 F.2d 1105, 1506 n. 1 (11th Cir.1990).

the night shortly before the accident. The district court also heard expert testimony from both sides on whether the twin engines were defectively designed. In addition, the district court gave the following contributory fault instruction to the jury:

> Your verdict must be for [appellee] if you believe: First, when plaintiff James Pree was standing on the swim platform at the rear of the boat, plaintiff knew of the danger of coming in contact with the propellers and appreciated the danger. And second, plaintiff James Pree voluntarily and unreasonably exposed himself to such danger. And third, such conduct directly caused or directly contributed to cause any damage plaintiff James Pree may have sustained.

The jury returned a general verdict in favor of appellee. No post-trial motions were filed. This appeal followed.

### DISCUSSION

#### I.

For reversal Pree argues that the district court erred in admitting evidence of his drinking and in giving the contributory fault instruction. Appellee argues that the district court correctly admitted evidence of Pree's drinking and that the contributory fault instruction was a correct statement of applicable Missouri law. In addition, appellee argues that, even assuming Pree's arguments are correct, the judgment in its favor should nonetheless be affirmed because Pree failed, as a matter of law, to prove that the propeller without guards was defective in a way not understood by the ordinary consumer. We affirm on the basis of the latter contention.

■■■ This product liability case comes to us on diversity jurisdiction and Missouri substantive law controls. Missouri has adopted section 402A of the Restatement (Second) of Torts. *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362, 364 (Mo.1969) (*Keener*); *McIntyre v. Everest & Jennings, Inc.*, 575 F.2d 155, 157 (8th Cir.) (Missouri law), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978). Strict tort liability applies to product liability ac-

tions arising out of the way a product was designed. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607 (Mo.1977). In order to recover under the theory of strict liability in tort for a defective design, Missouri law requires that a plaintiff prove the following elements:

> (1) [the] defendant sold the product in the course of its business;
>
> (2) the product was then in a defective condition unreasonably dangerous when put into a reasonably anticipated use;
>
> (3) the product was used in a manner reasonably anticipated;
>
> (4) [the] plaintiff was damaged as a direct result of such defective condition as existed when the product was sold.

*Linegar v. Armour of Am., Inc.*, 909 F.2d 1150, 1152 (8th Cir.1990) (*Linegar*), citing *Fahy v. Dresser Indus.*, 740 S.W.2d 635, 637–38 (Mo.1987) (*Fahy*), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). Because there are no real disputes as to the other three elements, we predicate our decision on the second element: whether the twin motors were in a defective condition unreasonably dangerous because they were designed without propeller guards. Whether a product is unreasonably dangerous is the determinative factor in a design defect case. *Hylton v. John Deere Co.*, 802 F.2d 1011, 1015 (8th Cir. 1986), citing *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 378 (Mo. 1986) (*Nesselrode*).

■■■ For purposes of imposing liability under Missouri's law of strict liability, a product's design is deemed defective when it is shown that the way that the product has been designed renders it unreasonably dangerous. *Nesselrode*, 707 S.W.2d at 377. Although Missouri courts have left the meaning of "unreasonably dangerous" to the common sense of the fact finder, *Linegar*, 909 F.2d at 1153, a product is defectively designed if it "creates an unreasonable risk of danger to the consumer or user when put in normal use." *Id.*, citing *Nesselrode*, 707 S.W.2d at 375.

## II.

Pree argues that the absence of propeller guards was a design defect which caused appellee's engines to be unreasonably dangerous and that the injuries from his fall were enhanced by the defective propellers.[3] Pree further contends that he presented evidence, which showed that the alternative and safer propeller guard design proposed by him was technically feasible and practical in terms of cost and the overall operation of the twin motors.

In contrast appellee argues that Pree's evidence was insufficient to prove that the engines were defectively designed because the propellers met the reasonable expectations of the ordinary consumer as to safety. They further argue that a safer practical alternative design was not available to appellee at the time it manufactured the twin motors. Hence, appellee argues that Pree failed to establish an essential element of his cause of action and his motion for a directed verdict should have been granted. We agree.

Unless a court can affirmatively say as a matter of law that the design renders a product "unreasonably dangerous," the question is generally one for the jury. *Nesselrode*, 707 S.W.2d at 378. However, the question is generally presented to the jury as an ultimate issue without further definition. *Id.* In determining whether a plaintiff has made a submissible case, we must examine the sufficiency of the evidence in the light most favorable to the plaintiff and view all inferences in his or her favor. *Coulter v. Michelin Tire Corp.*, 622 S.W.2d 421, 426 (Mo.App.1981).

Pree's evidence on the issue of whether the unguarded propellers were unreasonably dangerous when put to a reasonably anticipated use took two forms: Pree's attorney designed and tested a propeller guard and demonstrated it to the jury; Pree presented the testimony of two experts, Benjamin Kelly and Robert Swint. Benjamin Kelly's opinion on whether appellee's unguarded propellers were unreasonably dangerous was the result of observing tests done on several propeller guards. From these observations, Kelly concluded that appellee had not carried out an adequate effort toward developing a design, device or modification or a propeller guard intended to minimize personal injuries from propellers.

Robert Swint's opinion on whether the unguarded propellers were unreasonably dangerous was predicated on several tests he conducted on two types of propeller guards, one of which was designed by Pree. From these tests, Swint determined that appellee's engines as manufactured and sold without a propeller guarding device are defective. Pree presented no other evidence that appellees' twin engines were unreasonably dangerous.

Appellee also presented expert testimony. Richard Snyder testified that he conducted a variety of tests on propeller guard devices. From these tests he found that the devices increased the zone of danger, created conditions that could cause entrapment to human limbs, increased the likelihood of blunt trauma, and created unstable handling conditions. Snyder was of the opinion that the presence of propeller guards increased the likelihood and severity of injuries.

Don Kueny testified for appellee that he had the opportunity to evaluate and test various propeller devices. Kueny further testified that in 1985, when this accident occurred, a device did not exist that would provide people protection from propellers and that such device does not exist even at the present time.

---

3. Although Missouri courts have recognized contributory fault as an affirmative defense to actions based on strict liability, *see Keener v. Dayton Elec. Mfg.*, 445 S.W.2d 362, 365 (Mo. 1969); *Jarrell v. Fort. Worth Steel & Mfg. Co.*, 666 S.W.2d 828, 833 (Mo.Ct.App.1984), we have some concern over such instruction in a strict liability action brought for enhanced injuries. However, because our decision here turns on whether appellant showed that the twin engines were defectively designed, we see no need to address this issue and instead leave it for another case. Furthermore, we conclude that evidence of intoxication is irrelevant in a strict tort liability action for enhancement of injury. Moreover, it is not a determinative factor in this action.

James Getz testified that as Chairman of the National Boating Safety Advisory Council's Propeller Guard Subcommittee he compiled data and evaluated various propeller guarding devices. Getz testified that after the Propeller Guard Subcommittee conducted hearings and testing, it concluded that it could not recommend a propeller guard because they presented problems with respect to entrapment, blunt trauma and hydrodynamic issues. He testified that the United States Coast Guard had adopted the finding and recommendations of the Propeller Guard Subcommittee not to require or recommend propeller guards. 46 U.S.C. §§ 4302 & 13110 (1983).

Appellee also presented the testimony of two other experts, John Snider and James V. Benedict. Both experts were of the general opinion that there could be some protection by propeller guards, but only at very low speeds and barring entrapment. They concluded that the higher the speed of the boat the greater the adverse effect of any type of propeller guard, including the substantial risk that the guard itself would produce blunt trauma and injury to the head, chest, neck and extremities.

Additionally, although Pree forcefully argues that appellee could have employed a safer alternative design for their propellers, there was no evidence that such a design existed at the time the propellers were manufactured. Moreover, while some conflict existed in the expert testimony, experts for both sides conceded that at this stage neither industry custom nor pertinent regulations dictate the use of propeller guards. Witnesses for both parties also acknowledge that no boat manufacturer, or boating accessory manufacturer currently offers a propeller guard for planing pleasure boats for the purpose of protecting persons from propeller contact. In fact, Robert Swint, Pree's expert estimated that it would take more research and testing before an appropriate guard could be developed and marketed. He further concluded that the propeller guard proposed by Pree

and his attorney repeatedly broke after short term testing.

Experts for both sides also testified regarding the potential difficulties that propeller guards might engender and concluded that they cause boats to lose power and speed due to added drag. They further determined that some customers would likely remove the guards to save fuel and regain power. The experts also found that the guard removal would cause the boat to exceed its power rating which in turn would create additional handling difficulties.

After viewing the record in the light most favorable to Pree, we conclude that the evidence was insufficient to show that appellee's engines were unreasonably dangerous, and the district court should have declared as a matter of law, that the engines were not defective and directed a verdict for appellee.[4]

### III.

While we are aware that the Missouri Supreme Court has not adopted what is known as the "consumer expectation" test into their lexicon in deciding product liabilities actions, it has not rejected it. *See Cowens v. Siemens–Elema AB*, 837 F.2d 817, 822 (8th Cir.1988) (applying Missouri law). In fact, Missouri courts have concluded that "the plaintiff has the burden of proving that the product was unreasonably dangerous to the extent beyond that which would be contemplated by the user with ordinary knowledge common to the community as to its characteristics." *Cryts v. Ford Motor Co.*, 571 S.W.2d 683, 688 (Mo. Ct.App.1978) (citing Restatement (Second) of Torts § 402A, comment i); *see Racer v. Utterman*, 629 S.W.2d 387, 394 (Mo.Ct. App.1981); *Aronson's Men's Stores, Inc. v. Potter Elec. Signal Co.*, 632 S.W.2d 472 (Mo.1982); *Linegar*, 909 F.2d at 1152 (applying Missouri law).

The consumer expectation test focuses attention on the consumer rather than the

---

4. Although the parties have not raised this issue, "[w]e note that 'the standards for granting a directed verdict or judgment notwithstanding the verdict are the same under both federal and

Missouri law.'" *Sutherland v. Elpower Corp.*, 923 F.2d 1285 (8th Cir.1991) (quoting *SCNO Barge Lines, Inc. v. Anderson Clayton & Co.*, 745 F.2d 1188, 1192 n. 5. (8th Cir.1984)).

manufacturer of the twin engines. Applying the same consumer expectation test in a factually similar case, the Eleventh Circuit determined, as a matter of law, that a pleasure boat's unguarded propellers were not dangerous beyond the expectations of the ordinary consumer. *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990) (applying Alabama law which, like Missouri, adopted Restatement (Second) of Torts § 402A) (*Elliott*), *cert. denied,* —— U.S. ——, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991).

In *Elliott* the plaintiff was injured by a rotating propeller after jumping from a pier at night in the water next to an engine without a propeller guard. In reversing a jury verdict for the plaintiff, the court concluded that there are "certain products whose inherent danger is patent and obvious, [and that these products] do not, as a matter of law, involve defects of a sort that a jury should resolve." *Id.* at 1507; *see also Linegar*, 909 F.2d at 1153–54. The court reasoned that some products, by their nature, place both users and bystanders in some measure of danger. "A knife or an axe may cut persons, as well as their intended targets. Fishhooks can wound; saws can maim, and revolving propellers can cause fearful damage. Yet ... we do not hold manufacturers liable simply because the use of their products involve some risks." *Elliott*, 903 F.2d at 1507.

The present case is factually similar to *Elliott*. The claimed design defect in appellee's engines is the same as the alleged defect involved in the *Elliott* case: failure to provide a propeller guard. Therefore, we hold that the evidence presented in the instant case not only supported the jury's verdict, but the evidence was sufficient for the trial court to hold, as a matter of law, that the unguarded propellers were not unreasonably dangerous beyond the expectation of the ordinary consumer, including Pree.

Accordingly, the judgment of the district court is affirmed.